IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 11, 2018

**THOMAS LEE CAREY, JR. v. STATE OF TENNESSEE**
**Appeal from the Criminal Court for Davidson County**
**No. 2010-A-254     Mark Fishburn, Judge**

_____

**No. M2018-00292-CCA-R3-PC**

_____

The petitioner, Thomas Lee Carey, Jr., appeals the denial of his petition for post-conviction relief, which petition challenged his 2012 convictions of first degree felony murder, second degree murder, and especially aggravated kidnapping, alleging that he was deprived of the effective assistance of counsel. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Thomas Lee Carey, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Glenn R. Funk, District Attorney General; and D. Paul Dewitt, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arose from an incident in 1996 in which the victim, Michael Dickerson, was kidnapped and murdered by the petitioner and Glenn Sharber, III. *State v. Thomas Lee Carey, Jr.*, No. M2013-02483-CCA-R3-CD, slip op. at 14 (Tenn. Crim. App., Nashville, Mar. 10, 2015), *perm. app. denied* (Tenn. Jan. 21, 2016). The petitioner was originally indicted in March 1998, but the State declined to pursue the charges at the time after its key witness was murdered. *Id.*, slip op. at 2. In February 2010, the petitioner was re-indicted on the charges of first degree felony murder, first degree premeditated murder, and especially aggravated kidnapping. *Id.*, slip op. at 2. Four co-defendants were indicted at this time as well. *Id.* The petitioner and two co-defendants moved to dismiss the charges for denial of their rights to a speedy trial, but the trial court denied that motion after a hearing. *Id.*, slip op. at 4. After severance from his co-

defendants' cases, the petitioner's case was tried before a Davidson County Criminal Court jury. *Id.*, slip op. at 2. This court summarized the proof at trial as follows:

> [T]he evidence shows that the [petitioner] and Mr. Sharber, III kidnapped Mr. Dickerson from Haynes Park. Both the [petitioner] and Mr. Sharber, III had guns in the car with them. They asked Mr. Dickerson to get into the car and take them to Mr. Dickerson's brother. Mr. Dickerson looked afraid but got into the car. While the car was moving, Mr. Dickerson told the [petitioner] and Mr. Sharber, III that he did not want to take them to his brother, but he offered to call his brother to try to get Mr. Sharber, III's property back. However, the [petitioner] and Mr. Sharber, III did not stop the car to allow the [victim] to make the phone call; instead, they continued to a remote area. When they stopped the car, the [petitioner] ordered Mr. Dickerson out of the car and said that [he] could not let Mr. Dickerson go because he did not want Mr. Dickerson's brothers to come back for him. Thereafter, he shot Mr. Dickerson in the leg, causing him to fall down the hill. Later, in order to ensure that Mr. Dickerson was dead, the [petitioner] returned to the scene, found Mr. Dickerson on the hill, and shot him again.

*Id.*, slip op. at 14. The jury convicted the petitioner of first degree felony murder, second degree murder, and especially aggravated kidnapping,[1] and the trial court imposed an effective life sentence. On direct appeal, this court affirmed the petitioner's convictions, *Thomas Lee Carey, Jr.*, slip op. at 23, and our supreme court denied the petitioner's application for permission to appeal.

The petitioner filed a timely pro se petition for post-conviction relief on January 13, 2017. After the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, alleging the ineffective assistance of the petitioner's trial counsel on six grounds: (1) trial counsel failed to request a jury instruction based on

---

[1] We note discrepancies in the judgments in the record. The record includes a judgment for a jury verdict of guilty on the charge of first degree felony murder, a judgment for a guilty-pleaded conviction of especially aggravated kidnapping, and a corrected judgment, filed on February 13, 2014, for a jury verdict of guilty on a charge of first degree murder. However, the trial transcript shows that the jury imposed verdicts of guilty "for the offense of first degree felony murder," "for the offense of second degree murder," and "for the offense of especially aggravated kidnapping."

*State v. White*, 362 S.W.3d 559, 562 (Tenn. 2012); (2) trial counsel failed to call any witnesses for the defense; (3) trial counsel failed to adequately communicate with the petitioner and did not develop a defense strategy; (4) trial counsel failed to adequately prepare for trial; (5) trial counsel failed to negotiate a plea agreement; and (6) trial counsel failed to properly preserve the *White* jury instruction issue for appeal.

At the October 5, 2017 evidentiary hearing, the petitioner testified that he met with trial counsel "[m]aybe four or five times" before trial, during which time the petitioner was "incarcerated at the Criminal Justice Center" ("CJC"). Counsel provided the petitioner with discovery materials and reviewed these materials with the petitioner. The petitioner testified that he discussed with counsel the facts of this case and the allegations against him. The petitioner explained that when he was orginally charged in 1998, the crime was alleged to have "happened on Boyce Court" in the Bordeaux area of Nashville. When he was re-indicted in 2010, the crime was alleged to have occurred at Haynes Park Drive. The petitioner stated that he discussed this discrepancy with trial counsel, but counsel "didn't raise that in the trial."

The petitioner further testified that he informed trial counsel that he wanted to negotiate a plea deal "as low as possible," but counsel never discussed any plea offer with the petitioner. Instead, counsel told the petitioner "that we're going to be all right in trial." The petitioner said that he provided trial counsel with the names of several potential witnesses, including Natasha Graves, Latoya Buckner, Orlandus White, and Margaret Louise Adkins, and counsel hired an investigator to look into these witnesses, but counsel did not call any witnesses at trial. The petitioner described all of these potential witnesses as people he knew "[t]hrough the neighborhood" and "through middle school to high school." The petitioner understood that these witnesses had been interviewed by the detectives as well as trial counsel's investigator.

The petitioner testified that he waived his right to testify at trial based on the advise of trial counsel. The petitioner stated that trial counsel described his defense strategy as attacking the credibility of the State's witnesses. The petitioner told trial counsel that one of the State's witnesses, Tramale[2] Wright, had obtained his information about the case from an article in the Tennessean newspaper, but Mr. Wright "told the courts that [the petitioner] bragged about being involved in the homicide." Trial counsel did not present the Tennessean article in cross-examination of Mr. Wright. Additionally, Mr. Wright wrote two letters to police investigators stating that the petitioner had bragged to him about killing the victim. The first letter was dated May 22, 2010, and the second

---

[2] In the record, Mr. Wright's first name is spelled "Tramal" and "Tramale." We will use the second spelling as that is the spelling used by Mr. Wright himself in hand-written letters.

letter was dated June 28, 2010. One letter stated that the petitioner told Mr. Wright that the victim's "body was in Mount Juliet." The petitioner testified that trial counsel did not adequately cross-examine Mr. Wright about the inaccuracies in his letters.

The petitioner testified that trial counsel also failed to adequately cross-examine the petitioner's co-defendant, Mr. Carlos Lewis. The petitioner described Mr. Lewis as being a good friend, so much so that they got matching tattoos with the initials "C.M.G." During trial, Mr. Lewis testified that he was not a friend of the petitioner but rather was a friend of the victim. The petitioner testified that trial counsel did not address the gang activities or affiliations of the State's witnesses. The petitioner acknowledged that trial counsel's addressing the gang affiliations of the State's witnesses would have opened the door for the State to present the jury with the petitioner's gang affiliation. The petitioner was aware that trial counsel moved to exclude reference to his gang affiliation at trial, and the petitioner agreed with trial counsel at the time "that it was best probably to leave that out because . . . that will put a strike against me in the [j]ury's eyes." The petitioner contended, however, that trial counsel could have "argue[d] the facts . . . [that the petitioner] presented to him" and that counsel "didn't raise . . . a lot of issues." The petitioner stated that he "felt that [trial counsel] . . . gave probably [50] percent" in defending him and that, had trial counsel raised some of the issues that the petitioner wanted him to, it "could have helped him out." The petitioner stated that he was willing to testify even though his gang affiliation would likely be raised. He stated that "it probably would have been better for [him] to go on and put that out there, and let them know . . . [he was] affiliated in a Crip gang" and that Mr. Wright was a member of the rival Bloods gang. The petitioner contended that the rival gang membership of the State's witnesses could have been used for impeachment.

During cross-examination, the petitioner testified that the State provided him with documents that indicated the kidnapping occurred at 107 Boyce Court. He learned that witnesses Natasha Graves, Latoya Buckner, and Orlandus White told police they were present at the Boyce Court address when the kidnapping occurred. The petitioner explained that he wanted trial counsel to interview Ms. Graves, Ms. Buckner, and Mr. White and call them as witnesses to impeach Mr. Lewis' testimony that the kidnapping occurred on Haynes Park Drive. He stated that he also knew that they could not identify him as being present at the crime scene "because [he] wasn't there on Boyce Court." The petitioner testified that trial counsel never told him about his communication with these potential witnesses or explained why he did not call them to testify. The petitioner stated that if he had "had control of [calling witnesses], they would have been [t]here on [his] behalf." The petitioner asserted that he told trial counsel before trial that he wanted these witnesses subpoenaed, but counsel failed to do so. He stated that he knew that these witnesses would have provided favorable testimony based on their

-4-

statements made to the police. The petitioner acknowledged that Ms. Graves, Mr. White, and Ms. Buckner had been subpoenaed for the evidentiary hearing, but they informed the petitioner's counsel that they could not confirm the testimony the petitioner believed they would provide. The petitioner asserted that he was "pretty sure they couldn't confirm what else was said neither though," and "[t]hey probably just didn't want to speak on anything." The petitioner stated that had these witnesses told trial counsel before trial that they could not confirm the testimony that the petitioner expected them to give, trial counsel "would have let [him] know that."

The petitioner contended that 107 Boyce Court was a different location than the place Mr. Lewis testified as being the location of the crime and that this discrepancy "makes a lot of difference." The petitioner acknowledged that both the Boyce Court location and the Haynes Park location are "all in [his] neighborhood" but reiterated that the discrepancy was significant, stating that "if [the crime] happened on Boyce Court, it shouldn't change to Haynes Park." The petitioner contended that, had trial counsel impeached Mr. Lewis' testimony regarding the location of the crime, it "would have helped" him by "show[ing] that what Mr. Lewis was saying about him and Mr. Dickerson hanging on Haynes Park Drive all day was bull crap."

The petitioner acknowledged that trial counsel cross-examined the State's witnesses who were incarcerated with the petitioner about how they learned of the petitioner's involvement in the crime, but trial counsel did not introduce the newspaper article that the petitioner provided him. The petitioner asserted that trial counsel also failed to "raise certain issues about the gang affiliation." Trial counsel explained to the petitioner that addressing gang affiliations at trial would "raise . . . the eyebrows of the [j]ury," with which conclusion the petitioner agreed; however, the petitioner told trial counsel that "some things may need to be spoke [sic] on . . . to get the truth out of someone." The petitioner stated that he "follow[ed trial counsel's] lead on certain things" because he himself was "not a lawyer." The petitioner testified that he "wasn't satisfied with the way [trial counsel] performed in trial."

Trial counsel testified that he had been a licensed attorney since 1994 and had focused on criminal defense for "the last [20] years," during which time he had represented hundreds of criminal defendants, including some defendants charged with first-degree murder. In this case, he was appointed to serve as the petitioner's attorney. Trial counsel noted that representing the petitioner "was difficult" because the petitioner was incarcerated before his trial and "was ultimately in Mississippi [during] . . . the early part of the representation." He described his representation as "kind of long-distance" except when the petitioner was brought to Robertson County "under a couple warrants."

Trial counsel attempted to obtain the petitioner's file from the attorney appointed to represent the petitioner for the 1998 indictment but was unable to do so. The original indictment included a list of witnesses, and trial counsel had an investigator interview those witnesses, including Natasha Graves, Orlandus White, Margaret Adkins, Michael Cotton, Keith Teran, Frederick Morris, Clarence Williams, Robert Fisher, and Eric Yokley. As to other potential witnesses, trial counsel testified that he either "didn't get their names from [the petitioner] or . . . couldn't locate them." Trial counsel stated that he did not subpoena any of these witnesses at trial as part of his defense strategy because some witnesses had no "knowledge of the case," one witness said that he would not say anything, and another witness, Frederick Morris, "basically inculpated [the petitioner] in the murder." Trial counsel explained that the witnesses that the petitioner contends would have testified that the kidnapping occurred at 107 Boyce Court would not have so testified because they "really didn't know nothing [sic]" and "[t]hey added no value to the case for the [d]efense."

Trial counsel testified that "our major . . . pretrial motion was the motion for speedy trial and the delay." He also expressed concern about the jury's learning of the petitioner's gang affiliation because "when you tell a jury that your client is a gang member, then they automatically assume the worst" because "people are afraid of gang members." He moved to exclude references to gang affiliation at trial stating that "it was kind of part of the strategy, not to make this a gang war." Trial counsel proceeded to trial with a "reasonable doubt theory of defense due to the accomplice testimony of Mr. Lewis and then ultimately the jail house [witnesses]." Trial counsel explained that the law precluded him from cross-examining Mr. Lewis "on the range of punishment [he was] avoiding" by testifying for the State. His defense strategy was further impeded by "an adverse charge" regarding a threat made against Mr. Lewis during the lunch break at trial. Trial counsel testified that the "charge about the threat of the guilty mind . . . kind of bolstered [Mr. Lewis'] testimony." Trial counsel testified that he did his best to prevent that charge from being presented to the jury because it was not possible for the petitioner to have directed the threat against Mr. Lewis. Trial counsel testified that his trial strategy was based on impeaching the State's witnesses because that was the State's whole case, and they did not have any physical or forensic evidence tying the petitioner to the crime.

On cross-examination, trial counsel testified that the State's case "was built on accomplice testimony" and acknowledged that he did not put on any evidence for the defense. He advised the petitioner to not testify because "it opened up more of a can of worms." He "knew the statement of Mr. Frederick Morris . . . was out there," and he "was afraid about what might happen." He stated that the decision for the petitioner to not testify was made jointly with the petitioner. Trial counsel "made a pros and cons" list regarding the petitioner's testifying at trial, but it was the petitioner's decision not to

testify. Trial counsel conducted a *Momon* colloquy with the petitioner before the petitioner waived his right to testify at trial.

Trial counsel explained that the *White* decision "came out a month before [the petitioner's] trial, and . . . [he] was not aware of that opinion" at the time. Trial counsel testified that, at trial, he argued that "there was no evidence of a kidnapping," but the jury convicted the petitioner of second degree murder and felony murder with kidnapping as the underlying felony. Trial counsel testified that had he known about the *White* opinion at the time he "[o]f course" would have requested a *White* jury instruction but noted that "[w]hether it's applicable or not . . . [is] up to the [c]ourt to decide."

At the close of the evidence, the post-conviction court took the matter under advisement and issued a written order denying post-conviction relief on January 24, 2018. In its written memorandum opinion, the trial court made the following findings of fact:

> 1. [The p]etitioner was represented at trial and appeal by appointed attorney [trial counsel].
>
> 2. Trial counsel met with [the p]etitioner at least [four] times before trial. Visitation was complicated by the fact [the p]etitioner was housed in federal facilities during part of the pre-trial period.
>
> 3. [The p]etitioner received his discovery in this case. His trial counsel reviewed it with him and discussed his case.
>
> 4. The original indictment in this case had been dismissed previously due to the death of a witness.
>
> 5. [The p]etitioner gave counsel a list of potential witnesses in this case.
>
> 6. Trial counsel did not call any witnesses for the defense. The defense investigator spoke with all of the witnesses who could be located, but none of the witnesses would have had testimony favorable to [the p]etitioner.
>
> 7. Two of the prosecution's witnesses in this trial were "snitches" that had been incarcerated with [the p]etitioner.

8.    Trial counsel had jury trial experience and had tried murder cases prior to taking this case.

9.    Trial counsel did not bring up [the p]etitioner's gang affiliation at trial because he was afraid it would prejudice the jury against [the p]etitioner.

10.  Trial counsel's strategy was to emphasize the credibility problems of the witnesses and the fact that the State had no forensic evidence.

11.  Trial counsel advised [the p]etitioner not to testify in this case.  He would have permitted [the p]etitioner to testify if he had wanted to do so.

12.  Trial counsel did not ask for a jury charge pursuant to *State v. White* because he was unaware that it had issued, but he did not feel it would have made a difference in this case.

Because the petitioner's amended petition for post-conviction relief did not incorporate his pro se petition, the post-conviction court addressed only the issues raised in the amended petition.  The post-conviction court deemed the issue of the trial court's giving a jury instruction on criminal responsibilty waived because the petitioner offered no evidence on this issue at the evidentiary hearing.  Thus, the issues the post-conviction court considered included claims of ineffective assistance of counsel for (1) "failure to call any witnesses" at trial; (2) "failure to effectively communicate" with the petitioner; (3) "failure to request a jury charge pursuant to *State v. White*"; and (4) "failure to properly preserve the issue of whether an instruction purusant to *State v. White* should have been charged for appeal."

The post-conviction court denied the petitioner's request for post-conviction relief on each of the issues.  Specifically, the post-conviction court accredited trial counsel's testimony that the witnesses the defendant wished him to call at trial "were not helpful to [the p]etitioner's case," "implicated [the p]etitioner in the crime," or "could not be located."  The post-conviction court also noted that the petitioner failed to present any of these witnesses at the evidentiary hearing and that the court was unable, therefore, to determine what prejudice the petitioner may have suffered as a result of trial counsel's failure to call these witnesses.  The post-conviction court also concluded that the petitioner failed to show "how the outcome of this case would have differed" had trial

-8-

counsel communicated with him more. Because the peititoner did not present any evidence that the State made a plea offer that trial counsel failed to communicate to him, the post-conviction court denied relief on that issue. As to the issue of the *White* jury instuction, the post-conviction court determined that *White* was inapplicable and that trial counsel was not ineffective for his failure to request a jury instruction based on that case. Finally, the post-conviction court concluded that trial counsel "did all he could" to cross-examine Mr. Lewis, and the petitioner "failed to show that Mr. Lewis did receive favorable consideration" for his testimony.

In this timely appeal, the petitioner argues that the trial court erred by denying post-conviction relief, asserting that he was deprived of the effective assistance of counsel by trial counsel's failing to meet with the petitioner a sufficient number of times in order to "develop a sound defense theory"; failing to adequately impeach a State's witness regarding his source of knowledge about the case; advising the petitioner not to testify; failing to call certain witnesses; and failing to request a jury instruction based on the *White* case.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the

petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner has failed to carry his burden to prove by clear and convincing evidence sufficient facts to support his claim that trial counsel's representation was deficient. The petitioner first claims that trial counsel did not meet with him a sufficient number of times to establish a sound defense strategy; however, the petitioner's own testimony established that trial counsel met with him "four or five times," and counsel's accredited testimony established that his defense strategy was to impeach the credibility of the State's witnesses. Under the circumstances, this was a reasonable strategy, and we will not second-guess trial counsel's decision. *See Adkins*, 911 S.W.2d at 347.

Next, the petitioner claims that trial counsel was ineffective for his failure to adequately impeach the State's witnesses regarding the source of their information. However, the petitioner testified that trial counsel did cross-examine the State's witnesses regarding their sources of information about the case. The trial transcript shows that trial counsel questioned both Rodney Hilliard and Tramale Wright about the source of their information in this case, and counsel questioned Mr. Hilliard specifically about the Tennessean article. Both of these witnesses testified at trial that the petitioner told them of his involvement in this case and that they did not learn of the case from a news article. The jury heard all of this testimony and clearly believed the State's witnesses, as was their prerogative. That trial counsel chose not to offer the Tennessean article as evidence during impeachment is a matter of trial strategy, one which we will not second-guess. *See Adkins*, 911 S.W.2d at 347. The post-conviction court did not err by denying post-conviction relief on this issue.

-10-

The petitioner also claims that trial counsel was ineffective for advising him against testifying in his defense. The post-conviction court found that trial counsel advised the petitioner not to testify in part to prevent the jury from learning of the petitioner's gang affiliation. Under the circumstances, this was reasonable advice. The petitioner himself testified that he agreed with trial counsel that the jury's learning of his gang affiliation could be harmful to his defense. Ultimately, the decision whether to testify was the petitioner's alone, and the record establishes that the petitioner was so instructed and that he alone made that decision. The post-conviction court did not err in denying relief on this issue.

The petitioner next argues that trial counsel was ineffective for failing to call certain witnesses in his defense at trial. Trial counsel's accredited testimony established that he investigated all of the witnesses whose names he had been provided, none of whom could provide testimony beneficial to the petitioner's defense. The petitioner subpoenaed three witnesses to testify at the evidentiary hearing, but none could confirm the testimony that the petitioner expected them to provide. To support a claim of ineffective assistance of counsel premised on counsel's failure to call certain witnesses, "these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Black*, 794 S.W.2d at 757. A petitioner's failure, at the evidentiary hearing, to "produce a material witness who . . . would have testified favorably in support of his defense if called" precludes a finding of prejudice because "neither a trial judge nor an appellate court can speculate or guess . . . what a witness's testimony might have been if introduced by defense counsel." *Id.* at 757-58. Because the petitioner did not produce any witness at his evidentiary hearing, he cannot succeed on this claim, and the post-conviction court did not err by denying relief on this issue.

Finally, the petitioner asserts that trial counsel was ineffective for failing to request a jury instruction based on *White*. *White* provides that whether a kidnapping was "essentially incidental to an accompanying felony" "is a question for the jury after appropriate instructions." *White*, 362 S.W.3d at 562. "[T]rial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at 578.

Here, the record reflects that the trial court did not give, and trial counsel did not request, a jury instruction in accordance with *White*. Trial counsel conceded that

-11-

he did not request a *White* jury instruction because he was not aware of that case at trial. He also conceded that he would have requested a *White* jury instruction had he been aware of that case at the time. We need not decide whether trial counsel was ineffective for his failure to request the *White* instruction because the petitioner has failed to show that he was prejudiced by this omission. In post-conviction proceedings, whether a petitioner has suffered prejudice resulting from his counsel's failure to advocate against erroneous jury instructions depends on "whether a reasonable probability exists" that the jury would have reached a different conclusion had they been properly instructed. *Moore v. State,* 485 S.W.3d 411, 420-21 (Tenn. 2016) (citing *Plyant v. State,* 263 S.W.3d 854, 869 (Tenn. 2008)). Here, the petitioner has provided no factual support or legal authority to demonstrate how he might have achieved a different outcome at trial had the jury received an instruction pursuant to *White*. Thus, the petitioner is not entitled to relief on this issue.

Accordingly, we affirm the post-conviction court's denial of post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE

-12-